TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00198-CV






Milton R. Oliver and Vicky L. Oliver, Appellants


v.


Alexander Ortiz and Regina Lauricella, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT

NO. D-1-GN-05-004591, HONORABLE DARLENE BYRNE, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 Milton R. and Vicky L. Oliver appeal from a district court judgment awarding
damages and attorney's fees to Alexander Ortiz and Regina Lauricella (1) on claims relating to
appellants' sale to appellees of a business, "Oliver's Country Store," located in Red Rock,
Bastrop County. (2) The judgment was based on jury findings that Milton or Vicky Oliver had violated
the Texas Deceptive Trade Practices Act in connection with the sale. Appellants contended at trial
that appellees had induced them into the transaction by misrepresenting and concealing material facts
about the business and property, causing them to lose the value of their investment. On appeal,
appellants contend that appellees cannot recover on these claims as a matter of law because appellees
purchased the business and property "as is," thereby negating the element of causation as a matter
of law. See Prudential Ins. Co. v. Jefferson Assoc., Ltd., 806 S.W.2d 156, 161-62 (Tex. 1995). 
For the reasons explained herein, we will affirm the judgment.

 In November 2003, appellants had purchased the real property on which the store was
located from Pat and Henrietta Meuth. Appellants paid the Meuths cash and executed a $225,000
note secured by a vendor's lien and a deed of trust on the real property and the store's machinery,
equipment, furniture, fixtures, supplies, inventory, proceeds of and after-acquired collateral. Among
other rights under the agreements, the deed of trust stated that the Meuths could declare the debt
immediately payable and invoke remedies for default if appellants transferred any of the property
securing the debt without the Meuths's consent to a person other than a "permitted transferee," which
were generally limited to appellants' immediate family or entities under their ownership or control.

 In September 2005, appellants placed a classified advertisement in the
Austin American-Statesman stating, "General Store w/car wash on 3.5 ac in Bastrop area," and
listing a contact phone number. On September 20, Ortiz responded to the ad. A series of
conversations--mostly by telephone--followed between appellants and appellees, chiefly Ortiz and
Milton Oliver. The parties dispute the content of these conversations. Appellees claimed that
appellants repeatedly represented that the store had been grossing between $30,000 and $40,000
per month and netting profit of $2,000 per month. Appellants contended that they had indicated only
that the store could make that much money, and had on occasion. Appellants also complained that
appellees had refused to show them the store's books.

 The parties closed the transaction only ten days later. Ortiz testified at trial that
he had purchased and sold real estate in the past and had also purchased, operated and sold
various businesses. He did not seek legal counsel or outside opinions prior to purchase, explaining
that "[i]n the beginning I consulted lawyers and expert opinions" but "later on I got better at it [and]
I relied less and less on their expertise because in my personal experience dealing with an expert in
business does not guarantee it will make a good investment or not. So I relied more and more on my
own personal experience, and it has worked for me in the past." Ortiz testified that when purchasing
a business, he focused primarily on anticipated revenues. Relying on the representations regarding
the store's profitability that he alleged appellants made, Ortiz calculated that he could earn a suitable
return on his investment. He added that it was not unusual for him to conclude such a transaction
within ten days.

 At closing, appellees paid appellants $180,000 in cash. The parties executed a
"Commercial Lease" whereby appellees agreed to lease the store premises from appellees in
exchange for monthly rent payments of approximately $1,500 for 157 months--$220,000
total--with the right to purchase the property at an amortized price. Appellees were also provided
a "Bill of Sale" for the "Transferred Properties," defined as "Entire Inventory consisting of
foodstuffs, perishable items, dry-goods, non-alcoholic beverages and all other items for resale o[n]
the premises as of the date hereof." Of relevance to this appeal is the following provision of the
Bill of Sale:


 WITH THE EXCEPTION OF THE WARRANTIES OF TITLE,
INCLUDING THE WARRANTY THAT NO LIENS EXIST ON
THE TRANSFERRED PROPERTIES EXCEPT AS RECITED,
SELLER [the Olivers] HAS MADE NO AFFIRMATION OF FACT
OR PROMISE RELATING TO THE TRANSFERRED
PROPERTIES THAT HAS BECOME ANY BASIS OF THE
BARGAIN, AND FURTHER, SELLER HAS MADE NO
AFFIRMATION OF FACT OR PROMISE RELATING TO
THE TRANSFERRED PROPERTIES THAT WOULD
CONFORM TO ANY SUCH AFFIRMATION OR PROMISE. 
SELLER DISCLAIMS ANY WARRANTY OF FITNESS FOR ANY
PARTICULAR PURPOSE WHATEVER WITH RESPECT TO
THE TRANSFERRED PROPERTIES. THE TRANSFERRED
PROPERTIES ARE SOLD ON AN "AS IS" BASIS.


Also pertinent are the following provisions of the Commercial Lease:


 8. CONDITION OF PREMISES. Tenant [appellees] has
examined and accepts the leased premises and personal
property in the present as is condition as suitable for the
purposes for which the same are leased.

 

* * *


 33. PRIOR AGREEMENTS SUPERCEDED. This agreement
constitutes the sole and only agreement of the parties to this
lease and supersedes any prior understandings or written or
oral agreements between the parties respecting the subject
matter of the lease.


 Appellees began operating the store. Within a week or two, according to appellees,
they ascertained that store revenues were not close to what they contended appellants had led them
to believe. A further complication arose when appellees were informed by the Meuths that, as
appellees understood it, the Meuths had the right to void the entire transaction because appellants
had not obtained their permission to convey the property to appellees. (3) Appellees claim that they
attempted to raise these concerns with appellants, who purportedly responded with the general view
that a "deal's a deal." Alexander Ortiz testified that, fearing he would soon lose the store to the
Meuths, he began deeply discounting the store's inventory in an attempt to sell it and recoup at
least some of appellees' investment. Ortiz added that, resigned to the fate he anticipated, he let the
store's insurance lapse, did not replenish inventory, and planned to default on his November rent
payment. On Saturday, October 29, Milton Oliver entered the store premises, had the locks changed,
and excluded appellees from the premises. By this time, the store's shelves were virtually empty. Appellees subsequently sued appellants for damages, alleging theories of statutory
and common-law fraud, DTPA violations, and breach of contract. These claims were tried to a jury.
Appellees' basic theme at trial was that they were misled by appellants regarding the
store's profitability and the possibility that the Meuths could foreclose. Appellants denied any such
conduct. They added that appellees--whom they characterize as "sophisticated real estate
purchasers" and "business owners"--bought the store "as is," with minimal investigation, relying
on their own experience from their prior similar transactions, and were simply inept in managing the
store and in responding to their encounters with the Meuths.

 The jury found for appellees on liability theories including statutory and common-law
fraud, breach of contract, and DTPA violations. Regarding the DTPA claim, the jury found that
Milton or Vicky Oliver had engaged in a false, misleading and deceptive act or practice on which
appellees had relied and that was a producing cause of damages to them, and had failed to comply
with an express warranty that was a producing cause of damages to them. (4) Predicated on these
findings, the jury awarded appellees $120,000 in benefit-of-the-bargain damages. The jury further
found that Milton or Vicky Oliver had engaged in such conduct knowingly and intentionally and
awarded appellees $50,000 in additional damages, plus $15,000 each to Ortiz and Lauricella for
mental-anguish damages. The jury apportioned responsibility for the DTPA damages sixty percent
to Milton Oliver and forty percent to Vicky Oliver. However, the jury found in favor of appellants
on the following issue, numbered Special Issue No. 8 in the charge:


 Did Alexander Ortiz and Regina Lauricella buy the business and the
property "As Is"?

 

 "As Is" means the seller gives no assurances, express or
implied, concerning the value or condition of the thing sold.


 Appellees moved for judgment on the verdict, electing to recover on their
DTPA claim. Appellants moved to disregard the jury's liability and damage findings under the
DTPA and fraud theories on the basis that they were rendered immaterial by the jury's finding
in Special Issue No. 8 that appellees had purchased the business and property "as is." Appellees
relied on the rule that an agreement to purchase property "as is" negates causation, as a matter of law,
on claims predicated on acts or omissions relating to the property's condition or value. See
Prudential Ins. Co., 896 S.W.2d at 161-62; Spring Windows Fashions Div., Inc. v. The Blind Maker,
184 S.W.3d 840, 868-71 (Tex. App.--Austin 2005, writ dism'd by agr.). The district court rendered
judgment on the verdict awarding appellees a total of $80,000 from the Olivers, jointly and severally;
an additional total of $120,000 from Milton Oliver; prejudgment interest on these awards; and
attorney's fees in the amounts of $21,849 from the Olivers, jointly and severally, and $32,774.55
from Milton Oliver.

 The Olivers appealed. In three issues, they contend that appellees cannot recover
on their DTPA theories because appellees agreed to purchase the Oliver's Country Store "as is." 
"By agreeing to purchase something 'as is,' a buyer agrees to make his own appraisal of the bargain
and to accept the risk that he may be wrong," and "[t]he seller gives no assurances, express or
implied, concerning the value or condition of the thing sold." Prudential Ins. Co., 896 S.W.2d at
161. This reflects the public policy that "[f]reedom of contract allows parties to bargain for mutually
agreeable terms and allocate risks as they see fit." Gym-N-I Playgrounds, Inc. v. Snider, 220 S.W.3d
905, 912 (Tex. 2007). A valid "as is" agreement prevents a buyer from holding a seller liable under
claims relating to the condition of the property conveyed because it is legally impossible for any
injury to the buyer to have been caused by the seller; in effect, the "as is" agreement is an intervening
and superseding cause of the buyer's injury. Prudential Ins. Co., 896 S.W.2d at 161. Such an
agreement thus operates to negate, as a matter of law, the causation element of claims relating to the
condition or value of the property. Id.

 Courts will give effect to "as is" agreements unless set aside. Id. An "as is"
agreement may be avoided if it is fraudulently induced by misrepresentation or concealment of
information by the seller. See id. at 162 ("A buyer is not bound by an agreement to purchase
something 'as is' that he is induced to make because of a fraudulent representation or concealment
of information by the seller. . . . A seller cannot have it both ways: he cannot assure the buyer of
the condition of a thing to obtain the buyer's agreement to purchase 'as is,' and then disavow the
assurance which procured the 'as is' agreement."). Likewise, "a buyer is not bound by an 'as is'
agreement if he is entitled to inspect the condition of what is being sold but is impaired by the
seller's conduct." Id. "Other aspects of a transaction" may also make an "as is" agreement
unenforceable, including (1) the sophistication of the parties, which may include whether a party
is represented by counsel, (2) the terms of the "as is" agreement, (3) whether the "as is"
agreement was freely negotiated, and (4) whether the agreement was an arm's length transaction. 
Id.; Gym-N-I Playgrounds, Inc. v. Snider, 158 S.W.3d 78, 85 (Tex. App.--Austin 2005),
aff'd, 220 S.W.3d 905 (Tex. 2007).

 Appellants rely primarily on the contractual disclaimers in the Bill of Sale and
Commercial Lease. Appellees dispute whether these provisions are enforceable. However, before
we address the implications or enforceability of these provisions as "as is" agreements, we must first
consider whether, under ordinary rules of contract construction, they encompass or address the
subject matter of the alleged misrepresentations or concealment made the basis for appellees' DTPA
claims. See Spring Windows, 184 S.W.3d at 870-72. At least with respect to misrepresentations or
concealment of facts relating to the store's profitability, we conclude they do not.

 As noted, the jury heard evidence that appellants represented to appellees that the
store had been grossing between $30,000 and $40,000 per month and netting a profit of $2,000 per
month, and that revenues in fact turned out to be lower. The disclaimers in the Bill of Sale on which
appellants rely were addressed solely to "the Transferred Properties" and "affirmations of fact or
promise" or warranties "relating to the Transferred Properties." The Bill of Sale defined
"Transferred Properties" to mean the "Entire Inventory consisting of foodstuffs, perishable items,
dry-goods, non-alcoholic beverages and all other items for resale o[n] the premises as of the
date hereof." In other words, the disclaimers in the Bill of Sale related to the condition of the
store's inventory--e.g., were there insects in the food or had the milk spoiled--not how much money
the business was making. Similarly, the subject matter of the Commercial Lease was limited to
"the leased premises," defined as the real property where the store was located, plus "all trade
fixtures, improvements and personal property on the leased premises." (5) The "as is" clause in the
Commercial Lease thus addressed only the property where the business was located, not the
profitability of the business itself. The contractual provision on which appellants rely does not
address or encompass the alleged misrepresentations or concealment of facts regarding the
profitability of Oliver's Country Store.

 In addition to these contractual provisions, appellants suggest that the parties formed
an oral "as is" agreement that is somewhat broader than the written ones. (6) They primarily emphasize
the jury's finding in Special Issue No. 8. Special Issue No. 8 did not reference either of the written
contractual provisions and was much broader in scope. It asked whether appellees bought
"the business and the property 'As Is,'" further instructing the jury that "'As Is' means the seller
gives no assurances, express or implied, concerning the value or condition of the thing
sold."  (Emphasis added). The scope of Special Issue No. 8 corresponded to that of the
district court's DTPA damages submission, which inquired as to "[t]he difference, if any,
between the value of Oliver's Country Store as it was received and the price [appellees] paid for it." 
Special Issue No. 8 thus encompassed the subject matter of any alleged misrepresentation or
concealment that could have been the basis for appellees' DTPA recovery.

 Appellants suggest that because the jury found in Special Issue No. 8 that appellees
had purchased the business and property "as is," appellees cannot recover DTPA damages. We
cannot agree, at least as that issue was submitted here. Although Special Issue No. 8 inquired
whether appellees had bought the business or property "as is," that term was defined solely in terms
of whether appellants gave "no assurances, express or implied, concerning the value or condition
of the thing sold." In other words, Special Issue No. 8 inquired whether appellants had not made
"assurances . . . concerning the value or condition" of the business. The jury was not asked whether
the parties had agreed that the sale of the business was "as is." Thus, Special Issue No. 8, as
submitted here, amounted to an inferential rebuttal to the DTPA liability issues, which inquired
whether appellants had made representations or express warranties about the value or condition of
the business. (7) See Diamond Offshore Mgmt. Co. v. Guidry, 171 S.W.3d 840, 844 (Tex. 2005)
(citing Select Ins. Co. v. Boucher, 561 S.W.2d 474, 477 (Tex. 1978)) (defining inferential rebuttal
as a question that "presents a contrary or inconsistent theory from the claim relied upon for
recovery"). Consequently, appellants' contentions here ultimately amount to a complaint that the
jury's affirmative findings on both sets of issues conflicted. Amid the heat of trial, however, neither
party raised a conflict complaint before the jury was discharged. Under these circumstances, the
district court did not err in rendering judgment on the jury's DTPA liability findings despite the
jury's finding in Special Issue No. 8. See Spring Windows, 184 S.W.3d at 867; see also St. Paul Fire
& Marine Ins. Co. v. Murphree, 357 S.W.2d 744, 541 (Tex. 1962). (8)



 We overrule appellants' issues and affirm the judgment of the district court.



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed: August 5, 2008

1. Ortiz and Lauricella are husband and wife. We will refer to the parties collectively as
"appellants" and "appellees" for clarity.
2. Appellants describe Oliver's Country Store as "as general country store with gas pumps,
car wash, areas for groceries, feed store items and hardware for sale. There was the convenience
store area, an area where food could be cooked, served and eaten and a game room area, as well."
3. The Meuths did not testify.
4. However, the jury found that the neither Milton or Vicky Oliver had engaged in an
unconscionable action or course of action that was a producing cause of damages to appellees.
5. This was "included, but not limited to, trade fixtures, equipment, furniture,
kitchen equipment, grill, freezers, walk in cooler, gasoline pumps and tanks, television set, shelving,
car wash equipment, propane tanks, air compressor, pool tables, juke box, and storage building."
6. Neither party addressed any potential statute-of-frauds implications of an oral "as is"
agreement in the context of a transaction such as the one at issue here, or any other issues, beyond
those discussed above, bearing on the enforceability of such an arrangement. Our analysis above is
limited to the arguments the parties have raised.
7. In its submission of appellees' DTPA laundry list theory, the district court instructed the
jury that "false, misleading, or deceptive act or practice" meant:

 

Representing that Oliver's Country Store had or would have characteristics, uses or
benefits that it did not have; or


Representing that Oliver's Country Store was or will be a particular standard, quality
or grade if it was another; or

Representing that an agreement confers or involves rights or obligations that it did
not have or involve; or


Failing to disclose information about Oliver's Country Store that was known at
the time of the transaction with the intention to induce Alexander Ortiz and
Regina Lauricella into a transaction that they otherwise would not have entered into
if the information had been disclosed.


In its breach-of-warranty submission, the district court instructed the jury that:


An express warranty is any affirmation of fact or promise made by Milton Oliver or
Vicky Oliver that relates to Oliver's Country Store and becomes part of the basis of
the bargain. It is not necessary that formal words such as "warrant[y]" or "guarantee"
be used or that there be a specific intent to make a warranty. 
8. Cf. Billy Smith Enterp., Inc. v. Hutchison Constr., Inc., No. 03-06-00689-CV,
___ S.W.3d ___, 2008 Tex. App. LEXIS 5556 at *7-19 (Tex. App.--Austin July 23, 2008,
no pet. h.) (jury finding of affirmative contractual defense negated liability predicated on existence
of contractual payment obligation). Here, the jury's finding in Special Issue No. 8 does not render
the jury's DTPA liability findings legally immaterial, but represents an inconsistent finding regarding
the same material facts.